IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| LAMB EXCAVATION, INC., an Arizona corporation, | ) ) ) | 2 CA-CV 2002-0139 DEPARTMENT B |
| Plaintiff/Appellee, | ) ) | O P I N I O N |
| v. | ) ) | |
| CHASE MANHATTAN MORTGAGE CORPORATION, | ) ) ) | |
| Defendant/Appellant, | ) ) | |
| and | ) ) | |
| INTEGRA WINDOW & DOOR, INC.; ATKO BUILDING MATERIALS, INC.; and U.S. COMPONENTS L.L.C., | ) ) ) ) | |
| Defendants/Cross-Claimants/Appellees. | ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C-20010928

Honorable Jane L. Eikleberry, Judge

REVERSED AND REMANDED

Durazzo & Eckle, P.C.
  By Patric E. Durazzo                                                    Tucson
                                                Attorneys for Plaintiff/Appellee


Snell & Wilmer, L.L.P.
  By Marc G. Simon and Wade R. Swanson                                    Tucson
                                        Attorneys for Defendant/Appellant
                                               Chase Manhattan Mortgage
                                                              Corporation

Slutes, Sakrison & Hill, P.C.
  By James M. Sakrison                                                     Tucson
                                            Attorneys for Defendant/Cross-
                                                         Claimant/Appellee
                                                Integra Window & Door, Inc.


Norman R. Freeman II, P.C.                                                 Tucson
                                             Attorney for Defendant/Cross-
                                                         Claimant/Appellee
                                                  U.S. Components L.L.C.


Anderson, Brody, Levinson, Weiser & Horwitz, P.A.
  By Jeffrey H. Levinson & Janessa E. Koenig                            Phoenix
                                            Attorneys for Defendant/Cross-
                                                         Claimant/Appellee
                                               ATKO Building Materials, Inc.

E S P I N O S A, Acting Presiding Judge.

¶1         In this mechanics' lien foreclosure action, appellant Chase Manhattan Mortgage Corporation (Chase) appeals from the trial court's grant of summary judgment in favor of appellee Lamb Excavation, Inc. (Lamb). Chase contends the court erred in declining to apply the doctrine of equitable subrogation in its favor, which would have placed Chase in the primary lien position occupied by the construction lender after Chase provided permanent

financing for the subject project and satisfied the construction loan. We agree and reverse the grant of summary judgment in favor of Lamb and remand the case to the trial court for further proceedings consistent with this decision.

## Facts and Procedural Background

¶2     The essential facts are undisputed. In February 2000 Edwin and Catherine Torrejon obtained a construction loan from Commercial Federal Bank (CFB) to build a house on a parcel of property they had purchased. The loan was secured by a deed of trust. The Torrejons employed several subcontractors during construction, including Lamb, ATKO Building Materials (ATKO), U.S. Components, and Integra Window & Door (Integra). Those four subcontractors subsequently served on CFB and the Torrejons preliminary twenty-day notices of mechanics' and materialmen's liens pursuant to A.R.S. § 33-992.01. In November 2000, the Torrejons obtained permanent financing from Chase to satisfy the CFB construction loan, executing a promissory note and deed of trust to the property, which Chase recorded on December 15, 2000.[1] Shortly thereafter, Lamb, ATKO, Integra, and U.S. Components (collectively referred to as mechanics' lienholders), who had not been fully paid for their work, all recorded mechanics' liens against the property.

---

[1]The construction loan and the permanent financing differed in their terms: the CFB loan, by its temporary nature, had a one-year term, while the Chase loan was for thirty years; the CFB interest rate was 8.25% and the Chase financing, an adjustable rate note, carried an 11.275% interest rate; and the CFB loan was for the amount of $240,000, while the Chase note listed $248,000 as the principal balance.

3

¶3 In February 2001, Lamb filed an action to foreclose its lien, naming as defendants the Torrejons, CFB, Chase, and the three other mechanics' lienholders.[2] The three answered and filed cross-claims asserting lien priority positions identical to Lamb's. In November 2001 Chase moved for summary judgment, arguing its lien should be subrogated to the extent of the CFB lien. Lamb filed a countermotion for summary judgment, which the other three mechanics' lienholders joined, contending that Chase was not entitled to equitable subrogation because the CFB lien had been extinguished and thus there was no agreement or intent to subrogate. Lamb also argued that subrogation "would work a substantial injustice" on the lienholders. The trial court denied Chase's motion and granted the lienholders' motion instead.

¶4 In granting Lamb's motion for summary judgment, the trial court rejected Chase's argument that it was entitled to equitable subrogation, finding that Chase was "a sophisticated lender" and had "constructive notice of the potential for the filing of a mechanic's liens [sic] against the property when it made the loan." Citing *Mosher v. Conway*, 45 Ariz. 463, 46 P.2d 110 (1935), the trial court also found that the decision to apply equitable subrogation depends on the particular circumstances of each case and that applying the doctrine here would produce an "inequitable result" and be contrary to public policy. In

---

[2]In addition to the lien-foreclosure claim, Lamb's complaint and the subsequent amended complaint contained three additional counts for breach of contract, unjust enrichment and equitable lien, and quantum meruit.

addition, the court reasoned that subrogation did not apply because the terms of the CFB and Chase loans were "not identical." This appeal followed.

## Standard of Review

¶5        A trial court properly grants summary judgment if the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c)(1), 16 A.R.S., Pt. 2; *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990). Because determining whether Chase was entitled to equitable subrogation involves a question of law, we review *de novo* the issue of whether that relief is appropriate. *See Johnson v. Hispanic Broadcasters of Tucson, Inc.*, 196 Ariz. 597, 2 P.3d 687 (App. 2000) (entry of summary judgment reviewed *de novo*); *see also Andrews v. Blake*, 205 Ariz. 236, 69 P.3d 7 (2003) (availability and propriety of equitable relief reviewed *de novo*).

## Equitable Subrogation

¶6        The doctrine of equitable subrogation permits the substitution of one lienholder into the lien-priority position of a prior lienholder. Subrogation is "an equitable remedy designed to avoid a person's receiving an unearned windfall at the expense of another." Restatement (Third) of Property (Mortgages) (hereinafter "Restatement") § 7.6 cmt. a. In general, previously recorded liens have priority over subsequent mechanics' liens recorded after labor has begun or materials have been furnished. The mechanics' liens then have priority over later-recorded encumbrances. *See* A.R.S. § 33-992; *E. Sav. Bank v. Pappas*, 829 A.2d 953 (D.C. 2003); *see generally* Restatement § 7.6. But application of the doctrine of equitable subrogation allows a subsequent lender who supplies funds used to pay off a primary

5

and superior encumbrance to be substituted into the priority position of the primary lienholder, despite the recording of an intervening lien. *See Mosher; Peterman-Donnelly Eng'rs & Contractors Corp. v. First Nat'l Bank of Ariz.*, 2 Ariz. App. 321, 408 P.2d 841 (1965); *see also Mort v. United States*, 86 F.3d 890 (9th Cir. 1996).

¶7        On appeal, Chase contends it was entitled to equitable subrogation based on the two-part test enunciated in *Peterman-Donnelly*, which considers (1) whether an express or implied agreement to subrogate existed and (2) whether any prejudice to the lien claimants resulted. Conversely, Lamb urges us to uphold the trial court's ruling, asserting the trial court, in denying subrogation, properly considered factors such as Chase's actual or constructive notice of the intervening liens, its status as a sophisticated lender, and public policy issues. Thus, the parties disagree on the appropriate legal standard for assessing whether equitable subrogation should apply. In order to clarify the Arizona standard, we first review the approaches taken by other jurisdictions.

Majority Approach

¶8        The four primary elements of equitable subrogation are as follows: (1) the party claiming subrogation has paid the debt; (2) the party was not a volunteer; (3) the party was not primarily liable for the debt; and (4) no injustice will be done to the other party by allowing subrogation. *See Kuznik v. Bees Ferry Assocs.*, 538 S.E.2d 15 (S.C. Ct. App. 2000); *accord St. Paul Fire & Marine Ins. Co. v. Murray Guard, Inc.*, 37 S.W.3d 180 (Ark. 2001); *County v. Jensen*, 83 P.3d 405 (Utah Ct. App. 2003); *cf. Mosher*. A majority of jurisdictions apply the doctrine of equitable subrogation when the subsequent mortgagee had no actual knowledge

6

of an existing lien, reasoning that the subsequent mortgagee, having paid the preexisting obligation, reasonably had expected to step into the shoes of the previous creditor. *Houston v. Bank of Am. Fed. Sav. Bank*, 78 P.3d 71 (Nev. 2003) (characterizing, though declining to adopt, majority approach viewing equitable subrogation as defeated only by actual, but not constructive, knowledge of existing lien; adopting instead more liberal approach); *Osterman v. Baber*, 714 N.E.2d 735 (Ind. Ct. App. 1999) (same); *see, e.g., Han v. United States*, 944 F.2d 526 (9th Cir. 1991); *Smith v. State Sav. & Loan Ass'n*, 223 Cal. Rptr. 298 (Cal. Ct. App. 1985).[3]

Minority Approach

¶9        A minority of states, however, consider, in addition to the primary elements considered by the majority, such things as whether the subsequent mortgagee had constructive notice of intervening liens, the lender's sophistication, and the lender's negligence in failing to discover an existing encumbrance. *See, e.g.*, *Bankers Trust Co. v. United States*, 25 P.3d 877 (Kan. Ct. App. 2001) (denying equitable subrogation to negligent sophisticated lender); *Carl H. Peterson Co. v. Zero Estates*, 261 N.W.2d 346 (Minn. 1977) (equitable subrogation denied because of sophistication of party seeking subrogation); *see also Landmark Bank v. Ciaravino*, 752 S.W.2d 923 (Mo. Ct. App. 1988) (equitable subrogation allowed only in extreme cases bordering on fraud); *Richards v. Sec. Pac. Nat'l Bank*, 849 P.2d 606 (Utah Ct.

---

[3]Indeed, an "increasing trend" is to allow subrogation notwithstanding actual knowledge of intervening liens, if the parties had intended that subrogation occur. *Osterman*, 714 N.E.2d at 739.

App. 1993) (constructive notice of mechanics' lien defeats claim of equitable subrogation); *Kim v. Lee*, 31 P.3d 665 (Wash. 2001) (constructive notice bars equitable subrogation).

Restatement Approach

¶10      The Restatement sets forth an even more liberal rule concerning equitable subrogation than that of the majority of jurisdictions.  Section 7.6 of the Restatement states:

> (a)  One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment.  Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.
>
> (b)  [S]ubrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:
>
>      . . . .
>
> (4)  upon a request . . . to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.

Thus, under the Restatement, a subsequent mortgagee's negligence in failing to discover an existing lien does not preclude application of the doctrine so long as the intervening lienholders are not prejudiced.  And, notice is not a consideration.  Rather, the question is whether a subsequent mortgagee reasonably expected a security interest with the same priority as that of the mortgage being discharged.  *See* Restatement § 7.6(b)(4) and cmt. e; *see also Houston*.

8

**¶11** The rationale behind the Restatement's approach is that the intervening lienholder suffers no prejudice because its lien maintains the same position it occupied before the subsequent lender satisfied the pre-existing obligation. Restatement § 7.6 cmt. a. ("The holders of intervening interests can hardly complain about this result, for they are no worse off than before the senior obligation was discharged. If there were no subrogation, such junior interests would be promoted in priority, giving them an unwarranted and unjust windfall."); *see also Pappas* (focus of Restatement is on whether intervening lienholders prejudiced).

Arizona Approach

**¶12** As this court stated in *Herberman v. Bergstrom*, 168 Ariz. 587, 590, 816 P.2d 244, 247 (App. 1991), "[f]or equitable subrogation to apply, there must be an agreement, either express or implied, that the subsequent lender will be substituted for the holder of the prior encumbrance." *See also Peterman-Donnelly*. In addition, the subsequent mortgagee must not be a volunteer. *Id.* Because subrogation is a creature of equity, "its application may be defeated by intervening rights which would be prejudiced by the substitution." *Id.* at 326, 408 P.2d at 846. As an equitable construct, "[i]t rests upon the principle that substantial justice should be attained, regardless of form." *Mosher*, 45 Ariz. at 468, 46 P.2d at 115.

**¶13** Arizona's approach to equitable subrogation appears consistent with the Restatement: the doctrine will apply when there is an express or implied agreement to subrogate, which is concordant with a party's having a reasonable expectation of receiving a security interest, and when an intervening lien claimant suffers no prejudice. *See Peterman-Donnelly; see also Wetherill v. Basham*, 197 Ariz. 198, ¶ 13, 3 P.3d 1118, 1123 (App. 2000),

9

*quoting Ramirez v. Health Partners of So. Ariz.*, 193 Ariz. 325, ¶ 26, 972 P.2d 658, 665 (App. 1998) (Arizona courts usually follow Restatement absent controlling authority, provided its application "is logical, furthers the interests of justice, is consistent with Arizona law and policy, and has been generally acknowledged elsewhere.").

¶14 Although expressly declining to set forth a general rule for the future applicability of equitable subrogation, our supreme court in *Mosher* nonetheless stated, "when one, being himself a creditor, pays another creditor, whose claim is preferable to his, it is held that the person so paying is subrogated to the rights of the other creditor." 45 Ariz. at 469, 46 P.2d at 116. The court determined that whether the doctrine applies "depends upon the particular facts and circumstances of each case as it arises," *id*. at 468, 46 P.2d at 115, but equitable subrogation will not be applied when the subsequent creditor is a mere volunteer. *Id.*

¶15 *Peterman-Donnelly*, this court's most recent interpretation of *Mosher*, includes the following observation:

> Although the *Mosher* case indicates that an ad hoc approach is required, the following statement . . . approximates a generality:
>
> "[A] third person, having agreed to advance money to discharge an encumbrance on property of another, where he [or she] is not a volunteer, and where payment is made under an agreement that he [or she] will be substituted in place of the holder of the encumbrance, is entitled to subrogation, *whether such agreement is express or whether such agreement is implied*."

*Peterman-Donnelly*, 2 Ariz. App. at 325, 408 P.2d at 845 (citing what is now 83 C.J.S. *Subrogation* § 50, p. 583-4). Although the parties dispute the import of this language, which

10

Lamb characterizes as mere dicta, we find it persuasive when viewed in combination with the remainder of the court's analysis. Moreover, we do not find the two cases incompatible.[4] In considering whether to apply subrogation, the court in *Peterman-Donnelly* focused primarily on the parties' express or implied understanding and intent to subrogate and on whether any intervening rights would be prejudiced by subrogation. Neither *Mosher* nor *Peterman-Donnelly* requires that subrogation be denied where a subsequent creditor has actual or constructive notice of intervening liens; nor does either contain any language suggesting subrogation is inappropriate when a sophisticated lender is involved. Furthermore, *Mosher*'s dictate, were we to apply it, that courts must consider the facts and circumstances of each individual case,[5] seems merely to state the obvious, that, in evaluating an equitable subrogation claim, a court must necessarily consider the factual and procedural framework in which the case developed. Lamb's protestations notwithstanding, nothing in *Peterman-Donnelly* contradicts the general language in *Mosher*.

¶16        Having identified the appropriate parameters for applying equitable subrogation, we now examine whether the trial court failed to properly apply it here. We find that it did. First, as Chase maintains and Lamb does not dispute, there existed at least an implied

---

[4]Interestingly, the trial court in its decision cited *Mosher* for the proposition that the applicability of equitable subrogation depends upon the particular facts and circumstances of each individual case, but made no mention of *Peterman-Donnelly*.

[5]We note that, immediately after refusing to promulgate a general rule, the *Mosher* court remarked that "the modern tendency is to extend [equitable subrogation's] use rather than to restrict it" and that "it now has a very liberal application, its principle being modified to meet the circumstances of cases as they arise." 45 Ariz. at 468, 46 P.2d at 115.

agreement to subrogate, reflected in the form of the loan documents and escrow closing instructions. For example, the closing instructions provide that "[the] title insurance policy . . . must show [Chase's] mortgage to be a valid first lien against the property." In addition, one of the conditions in the closing instructions specifically stated that the loan was to "payoff the following: comm fed-$231100." It is clear and undisputed that Chase was not acting as a volunteer in paying off the CFB loan, and nothing in the record suggests its motivation was anything other than commercial.

¶17    Second, we agree with Chase that the trial court erred in finding that the mechanics' lienholders would be prejudiced by subrogation. In so finding, the court simply stated, without elaboration, that equitable subrogation would "defeat the rights of other creditors who would be prejudiced by its application" and that applying the doctrine would be "inequitable."

¶18    We fail to comprehend the nature of the perceived prejudice or inequity, as it appears the lienholders would remain in the *same* position they occupied before subrogation if that doctrine were applied. To the contrary, without subrogation, the lienholders would receive a windfall if elevated to a higher priority status. *See* Restatement § 7.6 cmt. a. The record establishes that when the lienholders agreed to perform work on the property they understood that CFB, not they, had a superior position. They therefore accepted the risk that the Torrejons would not pay them and would not pay the first lienholder, thereby defeating their liens. *See E. Boston Sav. Bank v. Ogan*, 701 N.E.2d 331 (Mass. 1998). Furthermore, although the lienholders emphasize Chase's alleged negligence, they offer no concrete

12

example of how subrogation would prejudice their interests other than characterizing themselves as "truly innocent intervening lienholders" who, if subrogation is denied, "will be paid for the work they have already performed and nothing else." Lamb's contentions rest solely on theoretical policy arguments and fail to demonstrate how applying the criteria stated in *Mosher* and *Peterman-Donnelly* supports the trial court's grant of summary judgment in its favor.

¶19 In denying equitable subrogation, the trial court cited the difference in terms between the CFB and Chase loans as an "important" factor in its decision, suggesting that, from the court's perspective, the lien claimants would have been prejudiced by the implementation of the Chase loan terms, which differed from the terms of the original CFB financing. However, it is well settled in Arizona that, when equitable subrogation is applied, its application is limited to the extent of the prior lien only. *See Mosher*; Restatement § 7.6 cmt. e. *Peterman-Donnelly* does not suggest otherwise. The *Mosher* court recognized the limits of subrogation, stating, "the doctrine . . . cannot give any greater rights to the subrogee than are held by the person to whose rights he is subrogated." According to the Restatement, "[t]he payor is subrogated only to the extent that the funds disbursed are actually applied toward payment of the prior lien. There is no right of subrogation with respect to any excess funds." Restatement § 7.6 cmt. e. The Restatement also recognizes that when a lender, such as Chase, demands a higher interest rate than that under the prior loan, the intervening lienholders may be jeopardized. In this situation, "[s]ubrogation should be granted only to the extent of the debt balance that would have existed if the interest rate had been unchanged." *Id*. While

13

emphasizing that the terms of the two loans differed, Lamb has failed to explain precisely how it is prejudiced by that difference. Indeed, Chase readily concedes that "its lien can only be subrogated to the extent of the [CFB lien]." Thus, if Chase is only subrogated to the extent of the original loan, the lien claimants can hardly claim they will be prejudiced. We see no reason to deny equitable subrogation on this basis.

¶20        Finally, we briefly address the trial court's statement that "Chase had constructive notice *of the potential for* the filing of a mechanic's lien[] against the property when it made the loan." (Emphasis added.) Significantly, when Chase recorded its deed, no mechanics' liens had yet been recorded. Thus, in addition to imposing an improper constructive-notice requirement, the trial court also impliedly charged Chase with notice of mechanics' liens not then in existence, based purely on the future possibility of such liens. *Cf. Richards* (commencement of visible work imparts constructive notice of lien). Regardless, the court's finding is irrelevant, given our determination that constructive notice is not an element of equitable subrogation under Arizona law. This conclusion is also consistent with those of the majority of jurisdictions that have addressed the issue. *See, e.g., Han; Smith; Osterman; Dodge City of Spartanburg, Inc. v. Jones*, 454 S.E.2d 918 (S.C. Ct. App. 1995).

**Disposition**

¶21        We reverse the grant of summary judgment in favor of Lamb and remand the case to the trial court for further proceedings consistent with this opinion. Both parties have requested attorney fees on appeal, and Chase also has requested attorney fees incurred at the trial level. In view of Chase's failure to provide any substantive basis for an award of fees, we

14

decline to grant its requests.  *See In re Wilcox Revocable Trust*, 192 Ariz. 337, 965 P.2d 71

(App. 1998).

**¶22**　　　　Reversed and remanded for further proceedings.

_____

PHILIP G. ESPINOSA, Acting Presiding Judge

CONCURRING:

_____

PETER J. ECKERSTROM, Judge

_____

JOSEPH W. HOWARD, Judge